37 Cal.Rptr. 74, 389 P.2d 538]

[L. A. No. 26751. In Bank. Feb. 27, 1964.]

IN THE MATTER OF THE REDEVELOPMENT PLAN FOR THE BUNKER HILL URBAN RENEWAL PROJECT 1B OF THE COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, CALIFORNIA, AND OF BONDS THEREFOR. COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, CALIFORNIA, Plaintiff and Respondent, v. HENRY GOLDMAN et al., Defendants and Appellants.

(And Five Consolidated Cases.)

24

26

Phill Silver, Austin Clapp, Wadsworth, Fraser & McClung, Charles E. McClung, Floyd H. Norris, Gwyn S. Redwine and Kent H. Redwine for Defendants and Appellants.

G. G. Baumen as Amicus Curiae on behalf of Defendants and Appellants.

Adams, Duque & Hazeltine, Henry O. Duque, Bruce A. Beckman, Eugene B. Jacobs, George J. Roth, Roger Arnebergh, City Attorney, James A. Doherty and Bourke Jones, Assistant City Attorneys, for Plaintiff and Respondent.

Bruce F. Allen, Joseph E. Coomes, Jr., and McDonough, Holland, Schwartz, Allen & Wahrhaftig as Amici Curiae on behalf of Plaintiff and Respondent.

SCHAUER, J.—This appeal is from judgments rendered by the superior court in a special proceeding brought by the Community Redevelopment Agency of the City of Los Angeles (hereinafter called the agency), and in five separate actions which were consolidated for trial with such special proceeding. The agency began its proceeding in December 1959, pursuant to sections 33955 through 33961 of the Health and Safety Code[1] (Stats. 1959, ch. 1542, p. 3868 et seq.), to determine (1) the validity of the redevelopment plan for the Bunker Hill Urban Renewal Project 1B (hereinafter called the Bunker Hill project), (2) the agency's authority to issue bonds to finance the project in part, (3) the validity of the bonds to be issued by the agency; and (4) for an injunction pursuant to section 33961 permanently enjoining the institution by any person or organization of any

[1]Unless otherwise stated, all section references are to the Community Redevelopment Law, found in sections 33000 et seq. of the Health and Safety Code, *as the designated sections read at the respectively pertinent times.*

To alert the reader who may hereafter undertake to consult the subject statutes in connection with the opinion text, we emphasize that the redevelopment law has been frequently amended; and further, that in 1963 many sections thereof were repealed and recast *under different section numbers* but ''without . . . substantive change in the law.'' (Stats. 1963, ch. 1812, § 1, p. 3677.)

action or proceeding raising any issue adjudicated or which could be adjudicated in the subject proceeding. The plaintiffs in the five separate actions which were consolidated (§ 33958) with the agency's special proceeding (hereinafter sometimes called "objectors") are property owners within the project area and taxpayers of the City of Los Angeles, and suing as such. The defendants in the five actions are the agency, the City of Los Angeles (hereinafter called the city), and in certain cases the city council of the city and the city treasurer.

The complaints in the five actions are for declaratory relief, for injunction, for writ of mandate or certiorari, or for judicial review pursuant to section 33746. The actions attack the proceedings of the agency, the city, and the council leading up to the adoption and the adoption of the ordinance approving the final redevelopment plan. The plaintiffs in the actions, as respondents in the agency proceeding, filed answers in the proceeding setting up defensively the same matters alleged in their several complaints.

As will appear, we have concluded that the trial court correctly determined that the redevelopment plan should be upheld, and that the judgments to that effect should be affirmed, with the exception of the award of costs against certain objectors.

The chronology of the Bunker Hill Project proceedings is in pertinent part as follows:

April 15, 1948. Pursuant to section 33201 the council adopted a resolution declaring a need for a redevelopment agency in the City of Los Angeles and thereafter the mayor appointed five members of the agency.

September 27, 1951. The council adopted a resolution authorizing the agency or the Los Angeles City Planning Commission (hereinafter called the planning commission) to designate redevelopment areas. (§§ 33480, 33481.)

October 31, 1951. The agency adopted a resolution designating 15 areas within the City of Los Angeles as blighted and requiring study to determine if redevelopment projects within such districts were feasible. The property embraced within the subject Bunker Hill project is a portion of Central Redevelopment Area 1. At the time of the designation of Central Redevelopment Area 1 as a redevelopment area there existed, as required by sections 33451 and 33452, a city planning commission and a master community plan which had been adopted by the planning commission, and which plan included the specifications detailed in section 33452.

August 11, 1955. The planning commission selected the area for the Bunker Hill project and formulated a preliminary plan therefor consisting of a preliminary report and a preliminary plan map. (§ 33500.) The project area is delineated by the following sketch.

FOR ILLUSTRATIVE PURPOSES ONLY

BUNKER HILL URBAN RENEWAL PROJECT

August 15, 1955. The planning commission submitted such preliminary plan to the agency and the agency thereafter, with the cooperation of the planning commission, formulated and prepared a tentative plan which was approved by the planning commission on March 26, 1956. (§ 33502.)

March 21, 1956. Pursuant to sections 33530, 33534, and 33535 (see Stats. 1951, pp. 1934-1935), the agency conducted a public hearing on the tentative plan after publication of notice thereof pursuant to section 33531 and mailing of notice thereof pursuant to section 33533. At the hearing oppor-

tunity was given to all interested persons and public and private agencies to be heard and to submit alternative redevelopment plans for the project area.

June 15, 1956. The agency submitted the tentative plan to the council together with the agency's report thereon in accordance with section 33560.

July 10, 1956, through September 6, 1956. Pursuant to sections 33562 through 33567, the council conducted a hearing on the adoption of the tentative plan after fixing the date thereof and causing notice to be published as required by section 33563. At such hearing the council considered the report of the agency and the recommendation and report of the planning commission, considered the alternative redevelopment plan submitted to the council, provided an opportunity for all interested persons and agencies to be heard, received evidence and communications presented with respect to the tentative plan and alternative plan and submitted the alternative plan and suggested modifications of the tentative plan to the agency and to the planning commission for recommendations and reports, which recommendations and reports were submitted to the council within 30 days thereafter.

November 7, 1956. The council adopted Ordinance No. 108424, approving the tentative plan. The ordinance included the matters enumerated by section 33571, among which were specifications of the "extent and character of blight."[2]

---

[2]In 1959 sections 33560 through 33574, which provided for a tentative plan, were repealed; and in 1961 section 33731 was amended to provide that upon presentation of the final plan "the legislative body shall find and determine that: (a) The project area is a blighted area. . . ." (Stats. 1961, ch. 1945.)

A "blighted area" which may become the subject of redevelopment under the Community Redevelopment Law is variously characterized by one or more of the conditions set forth in sections 33041 through 33044 (now §§ 33031-33034) of the Health and Safety Code. By section 33041, a blighted area is one "characterized by the existence of buildings and structures, used or intended to be used for living, commercial, industrial, or other purposes, or any combination of such uses, which are unfit or unsafe to occupy for such purposes and are conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, and crime because of any one or a combination of the following factors:

"(a) Defective design and character of physical construction.

"(b) Faulty interior arrangement and exterior spacing.

"(c) High density of population and overcrowding.

"(d) Inadequate provision for ventilation, light, sanitation, open spaces, and recreation facilities.

"(e) Age, obsolescence, deterioration, dilapidation, mixed character, or shifting of uses."

Thereafter, pursuant to section 33573 the council caused to be filed with the county recorder a description of the land

By section 33042, a blighted area is an area characterized, *inter alia*, by: "(a) An economic dislocation, deterioration, or disuse, resulting from faulty planning. (b) The subdividing ... of lots of ... inadequate size for proper usefulness and development. ... (d) The existence of inadequate streets [and] open spaces." By section 33043, a blighted area is "characterized by a prevalence of depreciated values, impaired investments, and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered." By section 33044, a blighted area is characterized by, "In some parts" thereof, "a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety, and welfare."

As required by section 33571, the city council in adopting the tentative plan included in the ordinance a statement of findings showing the extent and character of blight, obsolescence and substandard conditions in the area and their injurious and detrimental effects upon the public health, safety and general welfare. The statement of such findings, which the trial court found to be adequately supported by evidence adduced before the council at the hearing on the tentative plan, is as follows:

"Sec. 5. It is further found and determined that there exist in the Bunker Hill Urban Renewal Project area conditions of blight as defined in the Community Redevelopment Law which are social and economic liabilities requiring redevelopment in the interest of the health, safety and general welfare of the people of this City and of the State. Such conditions are conducive to ill health and transmission of disease, infant mortality, juvenile delinquency and crime, as follows:

"a) The project area consists generally of an incompatible mixture of buildings used for residential, commercial, industrial, residential and commercial mixed; structures intended for commercial use which have been converted to residential purposes, and vice versa; together with vacant land, and open land used for commercial purposes.

"There are approximately 477 structures in the area, of which 340 are residential, 132 are non-residential and five are public. The non-residential structures consist of commercial and industrial buildings.

"b) The residential structures contain dwelling units of which over 95 per cent were constructed before 1919. A very large percentage of said residential structures were constructed before 1900 or shortly thereafter. Said structures have faulty interior arrangement and exterior spacing, and by reason of age, obsolescence, and deterioration, have inadequate provision for ventilation, light, sanitation and open spaces.

"c) The survey made by the Health Department of the City of Los Angeles in accordance with the American Public Health Association technique, found 63.4 per cent of the residential structures in the area were classed as sub-standard or slum and of the remainder 20.8 per cent were poor and 15.8 per cent were acceptable. More than 55 per cent of said residential structures were in need of major repairs. Said survey further found that practically all of the former single family dwellings have been converted to incompatible type of living accomodations most of which were within the category of substandard or slum; that the

within the project area and a statement that proceedings for redevelopment of the area had been commenced under the

standards generally as to the dwelling unit conditions were primarily substandard to extremely substandard in nature; and that 1224 dwelling units in 38 structures were illegally occupied, and 4835 rooms in 271 structures were substandard as to room area.

"d) There exists in the area an overcrowding of structures on the land, due to the fact that said structures were built prior to the adoption of planning and zoning requirements relating to the proper location of structures on the land to provide yard areas, light, air and privacy and to prevent the spread of fire. On many parcels of land buildings two or more stories in height were built on or near the side lot lines and in several instances the eaves of one building overhang the eaves of another building.

"e) The area contains old, substandard buildings, mostly frame, from one to approximately ten stories. Many of the buildings are built on the down slope of the hill with one or two stories on the street front and as many as eight on the rear, making fire fighting and rescue operations practically impossible. These conditions, combined with overcrowding of structures on the land, the almost non-existence of fire walls and vertical openings, and the limited escape facilities, create one of the most serious fire and life hazards in the City of Los Angeles.

"f) The project area is characterized by highly irregular topography, with steep slopes and grades, sharp palisades and unusable lands, which in the past have required tunnels, a cable railroad and deep street cuts to provide some accessibility to or through the area, all of which conditions of the site not only contribute to serious fire and life hazards, inadequate streets and traffic bottlenecks, but further preclude the creation of desirable and adequate building sites for the proper utilization of the area, resulting in a stagnant and unproductive condition of land otherwise useful and valuable for contributing to the public health, safety and welfare.

"g) In many instances parcels of land are of such shape, size or topographical character, that they are inadequate for proper usefulness or development without the public assembly of such lands by the power of eminent domain, the clearance, site preparation, and upgrading of the entire project area to protect and promote the sound development of the project area and the general welfare of the community.

"h) There exist in the area inadequate streets, Clay St. being only 20 feet wide and Cinnabar St. only 30 feet wide. Hope St. has a divided gradient between Second and Third Streets; and in addition, Grand Ave., Flower St., Second and Olive Streets have steep grades. Such conditions are hazardous and tend to prevent proper improvement of the area.

"Sec. 6. It is further found and determined that:

"a) The conditions of blight existing in the area tend to further obsolescence, deterioration and disuse because of the lack of incentive to the individual landowner and his inability to improve, modernize or rehabilitate his property while the condition of the neighboring properties remains unchanged;

"b) The conditions of blight existing in the area contribute to a growing or total lack of proper utilization of areas, resulting in a

Community Redevelopment Law. At all times following adoption of the tentative plan, pursuant to section 33574 all applicants for building permits within the project area have been advised by the building and safety department of the city that such sites were within a proposed redevelopment area.

May 7, 1958. Pursuant to sections 33700 through 33710, the agency, with the cooperation of the planning commission, formulated and adopted a redevelopment plan (hereinafter referred to as the final plan) for the project area. Furthermore, pursuant to section 33701, and prior to the adoption of the final plan, the agency adopted and made available for public inspection rules implementing the provisions for owner participation as provided in the final plan.

May 8, 1958. Obedient to section 33704, the final plan was submitted to the planning commission for its report and recommendation. On May 15, 1958, the planning commission considered and approved the final plan and determined that it conformed to the adopted master community plan and on May 16, 1958, the planning commission made and filed with the agency its report and recommendation that the final plan be approved.

May 21, 1958. The agency submitted the final plan together with the report and recommendation of the planning commission to the council. The council fixed a time and place for public hearing on the proposed adoption of the final plan and caused notice thereof to be published, pursuant to section 33730. (Stats. 1957, ch. 1696, p. 3069.)

June 24, 1958, through January 8, 1959. As directed by sections 33730 through 33741, the council conducted a public hearing on the final plan on various dates, at which hearing the council considered the final plan, all alternative plans submitted, and all evidence and testimony for and against the adoption of the final plan and the alternative plans.

March 31, 1959. The council adopted ordinance No. 113.231 in form and substance as required by law, approving and adopting the final plan as the official redevelopment plan for the project area.

October 6, 1959. The agency adopted its resolution No. 193 authorizing the issuance of bonds of an aggregate face value

stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety and welfare.

''c) The conditions of blight existing in the project area contribute substantially and increasingly to the problem and cost of preserving the public health and safety, and the maintenance of adequate police, fire and accident protection.''

of not to exceed $20,000,000 the principal and interest of which are to be payable from funds which include taxes allocated to the agency pursuant to sections 33950 through 33954.

May 25, 1959 - July 25, 1961. The subject actions and the agency's special proceeding (the latter was filed December 28, 1959) were brought, trial was had, findings of fact and conclusions of law were filed, and judgments were entered in favor of the agency and (as appropriate) its codefendants. These appeals by most of the losing parties followed.

The judgment in the agency's special proceeding decrees in substance that the agency is lawfully established and entitled to transact business and exercise its powers pursuant to the redevelopment law; that all acts and proceedings theretofore taken by the agency, city planning commission and city council in the designation of Central Redevelopment Area No. 1, the designation of the Bunker Hill project area, the formulation and adoption of the preliminary plan, the formulation and adoption of the tentative plan, and the formulation and adoption of the final redevelopment plan were legal and valid; that the final plan as adopted by the city council on March 31, 1959, by ordinance No. 113,231, is legal, valid and effective in all respects; that the agency has lawful authority to issue bonds pursuant to the provisions of the final plan; that all acts and proceedings already taken and those proposed to be taken thereafter (as provided in the agency resolution) for the authorization, issuance, sale and delivery of the bonds and for the payment of the principal thereof and the interest thereon were and are legal and valid in all respects; that the bonds when duly issued as provided in agency resolution 193 will be valid in all respects; enjoined the institution by any person of any action or proceeding raising any issue or matter adjudicated therein or which could have been adjudicated therein; and awarded the agency its costs of suit.

Various contentions are presented by the objectors in their challenges, on this appeal, to the proceedings below. We consider such contentions severally under the following 11 main divisions.

## 1. SCOPE OF REVIEW

The trial court in its memorandum of decision declared the premise that in reviewing proceedings had under the Community Redevelopment Law the decisions of the agency and the council "as to matters of opinion and pol-

icy'' will not be set aside by the courts unless there is no reasonable justification for their actions. In determining whether or not such justification existed in the matter at bench the court reviewed the evidence upon which the agency and the council acted, and determined that the decisions and actions of those bodies were supported by substantial evidence; the court, however, declined to exercise its independent judgment upon such evidence, i.e., to reweigh it. The court also received additional evidence in the hearings before it "in order to determine the existence or non-existence of reasonable justification for such acts of the agency and the council and as to whether there was an abuse of discretion, fraud, collusion or bad faith.''

In *Babcock* v. *Community Redevelopment Agency* (1957) 148 Cal.App.2d 38 [306 P.2d 513], an earlier proceeding brought by one of the present objectors to enjoin the agency from proceeding with the Bunker Hill redevelopment, it was held (p. 49 [3]), "The agency and the legislative body (city council) have authority to designate redevelopment areas, and a court is not empowered to substitute its determination for the determination of the agency or the legislative body in the absence of abuse of discretion, fraud, collusion, or bad faith on the part of the agency or the legislative body.'' At the time of the *Babcock* decision section 33746 provided so far as here material that "Any action to contest the validity of the proceedings for the adoption of a redevelopment plan is barred upon the expiration of ... 30 days [after a specified cutoff date]. In any action commenced after the expiration of the 30-day period, except as to matters affecting jurisdiction, the validity of the proceedings is conclusively presumed.''

Thereafter section 33746 was amended in 1957 (prior to adoption of the final plan herein) to provide in pertinent part that "The findings and determinations of an agency and of a legislative body or of either of them, in the adoption and approval of any redevelopment plan ... may be judicially reviewed by a court of competent jurisdiction.''[3] (Stats. 1957, ch. 1696.)

---

[3]In 1961 the quoted provision was deleted from section 33746 (renumbered § 33500 in 1963) by amendment. The section as so amended reads: "No action attacking or otherwise questioning the validity of any redevelopment plan, or the adoption or approval of such plan, *or any of the findings or determinations of the agency or the legislative body* in connection with such plan shall be brought prior to the adoption of the redevelopment plan nor at any time after the elapse of 60 days from and after the date of adoption of the ordinance adopting the plan.'' (Stats. 1961, ch. 1557; Stats. 1963, ch. 1812; italics added.)

Objectors Babcock and Swigart, who seek review by mandamus, urge that the intent of the 1957 amendment to section 33746 was to modify the rule of the *Babcock* case and to provide for a broader type of judicial review; i.e., for review under section 1094.5 of the Code of Civil Procedure, and, more particularly, for the exercise by the trial court of its independent judgment on the evidence, especially the evidence with respect to blight. This argument is not persuasive.

The mere addition by the 1957 amendment of the express declaration in section 33746 that ''The findings and determinations ... may be judicially reviewed ...'' appears insufficient to abrogate the established rule that on review by mandamus of the discretion vested in a *local* administrative board, the court will not exercise an independent judgment on the evidence, but will limit its review to determining whether there was substantial evidence before the board to support the latter's decision. (See *Albonico* v. *Madera Irr. Dist.* (1960) 53 Cal.2d 735, 739 [2] [3 Cal.Rptr. 343, 350 P.2d 95], and cases there cited.) This rule, of course, applies also to state agencies whose jurisdiction is limited, rather than statewide (see *Keenan* v. *San Francisco Unified School Dist.* (1950) 34 Cal.2d 708, 714-715 [6] [214 P.2d 382]); thus, terming the city council a state agency or an administrative arm of the state when acting in redevelopment matters (see *Andrews* v. *City of San Bernardino* (1959) 175 Cal.App.2d 459, 462 [2a] [346 P.2d 457] ; *Fellom* v. *Redevelopment Agency* (1958) 157 Cal.App.2d 243, 247-248 [3] [320 P.2d 884]) lends no comfort to the position of objectors here, as its jurisdiction is local only. (See § 33278.)

Code of Civil Procedure section 1094.5 deals with review by mandamus of (subd. (a)) the ''findings'' and ''the determination of facts'' of administrative bodies both in cases where (subd. (c)) ''the court is authorized by law to exercise its independent judgment on the evidence'' (i.e., where the administrative body is statewide, see *Temescal Water Co.* v. *Department of Public Works* (1955) 44 Cal.2d 90, 105 [9] [290 P.2d 1] ; 2 Cal.Jur.2d, Adm. Law, § 220, p. 363; §§ 230, 231, pp. 383-386, and cases there cited), and in ''all other cases.'' There is nothing in the language of section 33746 specifying that ''The findings and determinations ... may be judicially reviewed . . .'' which indicates a legislative intent that the court shall apply the statewide agency rule and exercise its independent judgment on the evidence, rather than follow the substantial evidence rule which governs in

other cases. ▮▮▮ Thus, it becomes immaterial whether the actions of the agency and of the city council in adoption of the Bunker Hill project be termed "legislative" (see *Hunter* v. *Adams* (1960) 180 Cal.App.2d 511, 517, 519 [5a] [4 Cal. Rptr. 776]), or "administrative" (see *Andrews* v. *City of San Bernardino* (1959) *supra*, 175 Cal.App.2d 459, 461); in either event the trial court was correct in its refusal to reweigh the evidence and in confining itself to determining whether the findings and determinations of the inferior bodies were supported by substantial evidence. (See also *Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [1] [27 Cal.Rptr. 19, 377 P.2d 83].)

Objectors Babcock and Swigart urge further, however, that if the agency is successful in this case, then "in their condemnation action they will plead this validation case as a conclusive determination of the public use."

The confirmation (or validation) act (§§ 33955 through 33961) pursuant to which the agency brought its subject special proceeding was enacted in 1959. Section 33955 thereof provided:

"An agency which proposes to issue and sell bonds to finance or refinance, in whole or in part, a redevelopment ... project ... may, at any time after the effective date of the ordinance approving such plan and after the adoption of a resolution authorizing the issuance of bonds, bring a special proceeding in the superior court ... to determine its authority to issue such bonds, the validity of said bonds, and the validity of such redevelopment or renewal plan, including, without limiting the generality of the foregoing, the legality and validity of all proceedings theretofore taken for or in any way connected with the establishment of the agency, its authority to transact business and exercise its powers, the designation of the redevelopment ... area, the designation of the project area, the formulation of the preliminary plan, and the adoption of the redevelopment ... plan, and also including the legality and validity of the redevelopment ... plan finally adopted and the legality and validity of all proceedings theretofore taken, and (as provided in said resolution) proposed to be taken, for the authorization, issuance, sale and delivery of said bonds and for the payment of the principal thereof and interest thereon." (Stats. 1959, ch. 1542, §1, p. 3868.)

Objectors urge that if the Bunker Hill project area is not blighted there is no public use; that the determination by the

city council of blight is a determination of public use, a judicial rather than legislative question (see *City & County of San Francisco* v. *Ross* (1955) 44 Cal.2d 52, 57-59 [3-9] [279 P.2d 529]); and that objectors should not be foreclosed from challenging such determination. It appears to be accepted law, however, that redevelopment of blighted areas is a public use. (See *Redevelopment Agency* v. *Hayes* (1954) 122 Cal.App.2d 777, 789-790 [4], 802-804 [11-12] [266 P.2d 105].) Moreover, objectors are being accorded a judicial determination on the issue of blight through the substantial evidence review made in the subject proceeding by the trial court, and which is now before us on appeal. As is apparent from what has been said hereinabove, judicial determination does not, of course, inevitably mean that the courts will reweigh the evidence on which findings of an inferior tribunal or body are based.

In *In re Central Irrigation Dist.* (1897) 117 Cal. 382 [49 P. 354], cited by objector Babcock, the court simply applied the law to undisputed facts, and did not reweigh or exercise an independent judgment upon disputed evidence or upon matters of opinion or policy, as objectors would have the court do here. That case lends no support to objectors' position.

The trial court was correct in its refusal to exercise its independent judgment on the evidence upon which the agency and the city council acted.

### 2. MR. SESNON'S ELIGIBILITY AS AGENCY MEMBER

Following adoption by the city council in 1948 of the resolution declaring the need for a redevelopment agency (§ 33201), the mayor undertook to appoint "five resident electors of the community as members of the agency" (§ 33230), and in November 1948 the council approved the appointments. Mr. William T. Sesnon, Jr., who was one of those so appointed, continued to be a member of the agency at all times here involved. The adoption by the agency of the tentative plan in June 1956, and of the owner-participation rules and the final plan in May 1958, was in each case by three members of the agency, including Mr. Sesnon.

Objector Babcock contends that at such times Mr. Sesnon was a resident elector of the City of Beverly Hills, California, and not of the City of Los Angeles, and therefore not qualified to act as agency member, and that because his presence was necessary "to constitute a quorum, no quorum

was present and the purported actions so taken by the Agency were and are invalid.''

The trial court, citing sections 20 and 21 of the Elections Code and referring to evidence that for some time prior to July 28, 1948, Mr. Sesnon was a registered voter of Beverly Hills and on that date executed a new affidavit of registration giving a residence address in the City of Los Angeles, expressed the view that ''Were this a direct attack by quo warranto as to his position as an Agency member or a challenge to him as a voter, considerable doubt would exist as to his status as an 'elector' of the City of Los Angeles.'' However, concluded the court, Mr. Sesnon's status as an ''elector'' cannot be thus collaterally attacked in this proceeding and, in any event, he was a de facto member of the agency and thus the requisite quorum was present and voted on the matters in issue. In this the court was correct.

The de facto doctrine in sustaining official acts is well established. ▮ Present a de jure office, ''Persons claiming to be public officers while in possession of an office, ostensibly exercising their functions lawfully and with the acquiescence of the public, are *de facto* officers. . . . ▮ The lawful acts of an officer *de facto,* so far as the rights of third persons are concerned, are, if done within the scope and by the apparent authority of office, as valid and binding as if he were the officer legally elected and qualified for the office and in full possession of it.'' (*Town of Susanville* v. *Long* (1904) 144 Cal. 362, 365 [77 P. 987]; see also *Oakland Paving Co.* v. *Donovan* (1912) 19 Cal.App. 488, 494-496 [126 P. 388]; *Clark* v. *City of Manhattan Beach* (1917) 175 Cal. 637, 639 [166 P. 806, 1 A.L.R. 1532].) ▮ The facts as to existence of a de jure office of member of a redevelopment agency (see § 33200), that Mr. Sesnon acted publicly as such member under color of an appointment, and that it was generally assumed and accepted that he was a member of the agency were found by the trial court to be unassailable and meet no challenge on appeal. Hence, so far as this proceeding is concerned, Mr. Sesnon's acts are to be considered valid.

▮ It is likewise established that the right of a de facto officer to an office cannot be collaterally attacked. (*Oakland Paving Co.* v. *Donovan* (1912) *supra,* at p. 496; *Town of Susanville* v. *Long* (1904) *supra,* at p. 365.) A right to hold office may not be collaterally attacked by a challenge to the official acts performed by the person holding such office. (*Matter of Danford* (1910) 157 Cal. 425, 431 [108 P.322].) The objectors' challenge in this proceeding is to the acts

performed by Mr. Sesnon and not to his office and hence such challenge is collateral.

### 3. SUFFICIENCY OF PUBLICATION OF NOTICE OF AGENCY HEARING ON TENTATIVE PLAN

Section 33530, as effective in 1956, provided that "Before submitting the tentative plan to the legislative body the agency shall conduct a public hearing on it." Section 33531 stated that "The agency shall publish notice of the hearing not less than once a week for four successive weeks prior to the hearing. ..." Here the notice of such hearing was published February 28, 1956, March 6, 1956, March 13, 1956, and March 20, 1956, and the hearing was held by the agency on March 21, 1956. At that time section 6064 of the Government Code, found in the article having to do generally with manner of publication, provided that "Publication of notice pursuant to this section shall be once a week for four successive weeks. Four publications, whether in a daily or weekly newspaper, are sufficient. The period of notice commences upon the first day of publication and terminates at the end of the fourth week thereafter." (Stats. 1949, ch. 1587.)

Objector Trautwein argues that since the agency hearing on the tentative plan was held prior to expiration of the period of published notice as specified by section 6064 of the Government Code, a procedural deficiency thereby occurred which was jurisdictional and violated the requirements of due process, thus rendering subsequent proceedings on the entire Bunker Hill project fatally defective. The particular "jurisdictional" prejudice which objector asserts is that he was denied "an opportunity to file an alternate plan by reason of the failure of the Agency to comply with the statute." (See §§ 33534, 33535.)

This contention is not substantiated. In the first place, section 33533 (Health and Safety Code) provided for mailing of copy of notice of the hearing "to the last known assessee of each parcel of land within the area designated in the tentative plan, at his last known address. . . ." and no complaint is made of the manner in which this requirement was fulfilled or that any property owner failed to receive the mailed notice. In the second place, after the agency's hearing the city council also held a hearing on the tentative plan, following notice of which no complaint is here made. (§§ 33562-33565.) Section 33566 provided that "At any time prior to the adoption of a tentative plan by the legislative

body, any qualified person . . . may present to the legislative body an alternative plan for the project area,'' and section 33567 specified that ''Any alternative plan . . . submitted to the legislative body which has not already been considered and reported on by the agency . . . shall be referred to them for consideration and report. The agency shall report to the legislative body and make its recommendations on the alternative plan within 30 days. . . . The hearing on a tentative plan may be postponed or continued from time to time to allow time for the agency . . . to make such report.'' Thus, although objector Trautwein has not shown that he had an alternate plan, no reason appears why, if he did have one, he did not present it to the city council at the time that body held a hearing on the tentative plan. ·

Moreover, it does not appear that any objection was raised at the agency hearing on the tentative plan on the ground that the publication of notice was defective; nor does it appear that the issue was raised at the hearing before the council on either the tentative or the final plan. No prejudice is shown.

Further, section 33959 of the confirmation act, pursuant to which the agency brought the subject special proceeding, directed that in such a proceeding ''the court shall disregard any error, irregularity or omission which did not affect the substantial rights of the parties.'' (Stats. 1959, ch. 1542, p. 3870.) As held by the trial court, this provision is in the nature of a curative clause, and it is established that unless there is an absence of due process the Legislature, with respect to the minutiae of the number of publications, ''might omit them altogether without affecting the validity of the proceeding, [and] so also it may provide that defects or failures to comply shall not be fatal.'' (*Ells* v. *Board of Supervisors* (1918) 38 Cal.App. 480, 484 [176 P. 709].) ▆▆▆ And as declared in *Chase* v. *Trout* (1905) 146 Cal. 350, 359 [80 P. 81], ''A curative statute or clause may preclude all investigation except 'the single inquiry whether, in the case presented, the effect of applying the statute is to deprive the party of his property without due process of law.' '' (See also *Miller* v. *McKenna* (1944) 23 Cal.2d 774, 781-782 [5] [147 P.2d 531] ; *Redevelopment Agency* v. *Modell* (1960) 177 Cal.App.2d 321, 325-326 [4] [2 Cal.Rptr. 245] ; *Rock Creek W. Dist.* v. *County of Calaveras* (1955) 133 Cal.App.2d 141, 146 [3] [283 P.2d 740].) ▆▆▆ No such deprivation of due process has occurred in the respect here considered.

## 4. BLIGHT

In addition to the council's findings as set forth in the footnote (fn. 2, *ante*), the condition of area blight was further established at the hearing on the final plan. A health department survey of December 1955 disclosed the following percentages in living conditions: extremely substandard 39.62 per cent, substandard 22.22 per cent, poor 19.92 per cent, and acceptable 18.24 per cent. A building and safety department survey of April 1957 discloses the following percentages in building conditions: dangerous (239 out of 395) 60 per cent, substandard 16 per cent, and standard 24 per cent. The area crime rate was testified to be double the city average and the arrest rate within the project area more than eight times the city average. There was testimony that the fire rate per acre was nearly nine times the city average and that the per acre cost of fire control for inspection was nearly eight times the city average. It was established that for the year 1957, the city tax revenue from the project area amounted to $106,120 and that the estimated cost to the city for fire, police and health services rendered to the project area was $754,101.

In the light of all the described conditions the trial court concluded that there was a reasonable basis for the finding and determination by the city council that the project area is blighted within the meaning of the Community Redevelopment Law.

Objector Babcock, whose property is at the southwest corner of Second Street and Grand Avenue, refers to "Extension of the Civic Center west of Hill Street, land acquisition and demolition of old structures by the County of Los Angeles between 1st and 2nd Streets, Broadway and Grand Avenue and construction of the Music Center nearby," and to testimony by one witness that "by reason of the Civic Center improvements north of First St., that it would be reasonable to expect certain areas south of First Street to be developed, within a block to three blocks of the courthouse." It is urged that given time, redevelopment of the project area would take place "without public intervention," and that therefore the finding of blight is unwarranted and unsupported. Such speculative argument cannot prevail, particularly at this stage of the proceedings, as against the existing conditions with which the agency, the city council, and the courts were (and are) obliged to deal.

### 5. Area South of Fourth Street

Prior to adoption of the tentative plan, an alternative plan for the project was filed with the agency (see § 33566) on behalf of objector Briggs Apartment Hotel Company (hereinafter called Briggs), which sought to eliminate from the project area that part thereof lying south of Fourth Street. Although this alternative plan was urged by Briggs at the public hearing before the city council on the tentative plan and again at that on the final plan, the council rejected it on both occasions.

It is contended that failure of the council to adopt the alternative plan eliminating that portion of the project area lying south of Fourth Street constituted an abuse of discretion in that such portion is not a blighted area within the meaning of the Community Redevelopment Law nor is it necessary for the effective redevelopment of the entire project area. (§ 33004.) This contention presents an issue which appears to have been closely balanced at the administrative level but the resolution of which cannot (upon the record and in the light of established law) be reversed or vacated by this court. However, it merits discussion.

As pointed out by the trial court (see also the area sketch, *ante*), the southern boundary of the project area at the westerly end begins at the intersection of the Harbor Freeway and Fifth Street and progresses easterly along Fifth Street to a point midway between Flower and Hope Streets and then jogs in an uneven line approximately midway between Fourth and Fifth Streets to Olive Street, thus eliminating several large and modern buildings on the north side of Fifth Street such as the Sunkist Building, the Edison Building, the Biltmore Garage, and the Pacific Telephone and Telegraph Company Buildings. The project area line then turns north on Olive to Fourth Street and thence easterly to Hill Street, thus excluding all the buildings within the block bounded by Fourth, Fifth, Hill and Olive Streets which block is substantially developed with multistory buildings.

That part of the project area lying south of Fourth Street comprises portions of five city blocks aggregating 23.17 acres and constitutes approximately 17 per cent of the entire project area.

Briggs, the owner of the Barbara Worth Apartments, 407 South Hope Street, a cement and stucco apartment house of 57 units with private bath and not substandard, urges that the Fourth Street viaduct and cut has created a natural bar-

rier separating the territory south thereof from the main Bunker Hill area and that by reason of changes within the project area south of Fourth Street before the adoption of the final plan, such territory is not blighted within the Community Redevelopment Law so as to be properly includable in a redevelopment project.

Prior to 1954 there were approximately 40 major buildings in the project area lying south of Fourth Street, 15 of which were devoted to basically residential use, 14 of which were utilized for essentially commercial pursuits, 10 of which housed mixed residential and commercial uses, and one of which was occupied for public use. At the time of the adoption of the final plan, there were approximately 17 major buildings in the area, of which 9 were devoted primarily to residential or mixed use and 8 to commercial or public use.

The Pacific Telephone and Telegraph Company instituted an eminent domain proceeding to condemn and acquire property within the project area south of Fourth Street, fronting on Grand Avenue, and has expressed its intention to construct a building thereon; Pacific Mutual Life Insurance Company has acquired property within the project area south of Fourth Street, and has expressed its intention to construct a building thereon; and Greater Los Angeles Plans, Inc., a nonprofit corporation, and Pacific Electric Railway Company each own property within the project area south of Fourth Street between Hope Street and the Harbor Freeway.

It appears that the Fourth Street cut caused the removal of approximately nine buildings and the land acquisition by Pacific Telephone and Telegraph Company and Pacific Mutual Life Insurance Company caused the removal of three residential buildings and that the others eliminated since 1954, mainly on Figueroa and Flower Streets, were removed by reason of obsolescence.

As of 1959, the land uses in the challenged area were 84.4 per cent open and unimproved; 8.66 per cent commercial and hotel and 8.94 per cent apartment and residential income. To offset any implication of "widely scattered ownership" (§ 33013), it was established that in 1959 the combined land assemblage represented by ownership by Pacific Electric Railway Company, B.F. Coulter Company, Greater Los Angeles Plans, Pacific Mutual Life Insurance Company, and Pacific Telephone and Telegraph Company accounted for 66.6 per cent of the land within the challenged area.

Briggs urges with merit that the characteristics of blight

set forth in section 33041 are not likely to exist in an area having a land use such as the challenged area in 1959. It further urges with merit that the element of scattered ownership does not exist in the challenged area. It urges that, if the alternative use of the westerly portion of the challenged area be for parking as shown on the proposed land use diagram of the final plan, most of that portion is now being used for such purpose hence it cannot be considered as stagnant or unproductive. It was the opinion of two experienced real estate appraisers that the property within the challenged area if removed from the threat of condemnation would develop with private capital similarly to property south of Fifth Street.

In short, Briggs contends that whereas the project boundary "made sense" in 1950, it did not in 1959 when the council adopted the final plan, and that reasonable minds cannot differ as to the boundary under conditions in 1959.

The agency answers these contentions as follows: (1) Although some of the elements of blight may have been removed, the challenged area is still blighted within the Community Redevelopment Law, (2) an elimination of the challenged area would prevent a realignment of Flower Street which is an integral part of the redevelopment plan, (3) the topography of the challenged area particularly at Hope Street and Grand Avenue would lead to an island of blight between Fourth and Fifth Streets, (4) the challenged area is includable in any event under section 33004 (now § 33321), and (5) the court may not substitute its judgment as to the wisdom of including the challenged area if there is any reasonable justification for the action of the legislative body.

We may recognize, as did the trial court, that unquestionably some of the elements or manifestations of blight as set forth in section 33041 have been eliminated by the demolition of a number of residential buildings south of Fourth Street between 1954 and 1959. Also, the recent acquisitions of properties by the Pacific Mutual Life Insurance Company and Pacific Telephone and Telegraph Company have removed those properties from a "stagnant and unproductive condition." (§ 33044.) On the other hand, from a general comparison of the area between Flower Street and the Freeway from Fourth to Fifth and the like area from Fifth to Sixth Streets, a conclusion can reasonably be drawn that the territory west of Flower between Fourth and Fifth Streets is generally stagnant and is more closely allied to the stagnant condition of properties north of Fourth Street than it is to

the development of properties south of Fifth Street. In this connection the trial court found that although the Fourth Street cut has physically severed the southern part of the project area at Hope Street and Grand Avenue, the challenged area south of Fourth Street is clearly integrated topographically with the area north of Fourth Street and this furnishes an additional reason for its inclusion in the redevelopment project.

Section 33004 (now § 33321) provides: "A redevelopment area need not be restricted to buildings, improvements, or lands which are detrimental or inimical to the public health, safety, or welfare, but may consist of an area in which such conditions predominate and injuriously affect the entire area. A redevelopment area may include lands, buildings, or improvements which are not detrimental to the public health, safety or welfare, but whose inclusion is found necessary for the effective redevelopment of the area of which they are a part."

Hence, even though the challenged area may not itself be blighted but its "inclusion is found necessary for the effective redevelopment of the area" of which it is a part, it is properly includable in the redevelopment project. The legislative body made such a determination and it cannot be said there is no reasonable basis for such determination even though it might appear that a redevelopment plan could be formulated without including the area south of Fourth Street.

It would appear that there is a rather close analogy between zoning and redevelopment in the matter of boundary determination. The observation of this court in the case of *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 495 [18] [234 P. 381, 38 A.L.R. 1479], is particularly apposite: "Somewhere the line of demarcation must be drawn, and it is primarily the province of the municipal body to which the zoning function is committed to draw that line of demarcation, and it is neither the province nor the duty of courts to interfere with the discretion with which such bodies are invested in the absence of a clear showing of an abuse of that discretion. In short, as previously indicated, we are not permitted to substitute our judgment for the legislative judgment."

In *Berman* v. *Parker* (1954) 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. 27], in answer to a contention that a certain developed property within a redevelopment area did not contribute to the blight and hence should not be included in the project

area, the United States Supreme Court said at page 35 [99 L.Ed. 39] : "It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need for a particular tract to complete the integrated plan rests in the discretion of the legislative branch." (See also *Grubstein* v. *Urban Renewal Agency of City of Tampa* (Fla. 1959) 115 So.2d 745, 748 [1,2] : "If the Project plan, as a whole, is valid, then the inclusion therein of sound structures or vacant land does not necessarily invalidate the Project. This is so because the purpose of the Urban Renewal Law is to transform an entire slum *area* into a wholesome section of the community; and to deny the City the right to include within the area certain houses or buildings in good condition would, in some instances, defeat the over-all purpose of the statute and the Project.")

Contrary to the contentions of Briggs, the trial court found that all of the evidence received by the council did not show that the area south of Fourth Street did not require replanning and land assembly in the interests of the general welfare; it further found that the demolition of buildings south of Fourth Street has changed to some extent the geographical, economic and sociological conditions in that area; that such area has not become physically and economically disassociated from the rest of the project area; that all the evidence adduced at the public hearing on the final plan did not demonstrate that such area was not then stagnant and unproductive; and that the sole reason for the inclusion of that area was not to obtain the anticipated increase in tax revenue for the servicing of the agency bonds and financing the project.

Briggs has ably presented an issue which was close at the administrative and trial court levels. But we cannot tenably hold that as a matter of law there was no reasonable basis for rejection by the council of the alternative plan urged by Briggs; neither can we say that the trial court's relevant determination is unsupported.

6. COMPLIANCE OF FINAL PLAN WITH SECTION 33707

Section 33707 (see present § 33333) provided:

"Every redevelopment plan shall show:

"(a) The amount of open space to be provided and street layout.

"(b) Limitations on type, size, height, number, and proposed use of buildings.

"(c) The number of dwelling units.

"(d) The property to be devoted to public purposes and the nature of such purposes.

"(e) Other covenants, conditions, and restrictions which the legislative body prescribes."[4]

The Swigart, Trautwein and Redwine actions each vigorously attack the final plan on the ground that it does not, for various reasons, comply with the provisions of section 33707.

Their contentions may be summarized as follows:

(1) The final plan does not set forth and there cannot be ascertained therefrom, the matters specified in subdivisions (a), (b), and (d) of section 33707;

(2) The final plan vests power in the agency not contemplated by law;

(3) The plan is not "final" for the reason that many of the material phases are stated to be "tentative";

(4) The final plan is an unlawful restraint on alienation in reserving to the agency the uncontrolled power to invalidate reconveyances, leases and resubdivisions;

(5) By reason of the foregoing lack of compliance with the Community Redevelopment Law, the final plan contains no standards to guide the discretion of the agency in executing the plan, thus constituting an unlawful delegation of power to the agency by the council.

To place the contentions with respect to section 33707 in proper perspective, it must be understood that the matters referred to in that section are only a segment of the entire "redevelopment plan" or final plan, as it has been termed in this opinion. Other provisions to be made in the final plan include owner-participation (§ 33701), method of financing (§ 33706), acquisition of property (§ 33708), lease or sale of property (§ 33709), issuance of bonds (§ 33710), housing for

---

[4]The redevelopment law further provides that at any time after adoption of a final plan by the legislative body, that body may, if it becomes necessary or desirable, amend such plan upon recommendation of the agency, after the agency has held a public hearing on the proposed amendment (upon published and mailed notice), and after the planning commission has likewise made its recommendation and report to the legislative body, and after the legislative body has then held a public hearing upon the proposed amendment (upon published notice). Each such amendment proceeding would appear to require minimum elapsed time of between 10 and 11 weeks. (§§ 33450-33455, formerly § 33747.)

displaced persons (§ 33738), and safeguards assuring redevelopment (§ 33741). It appears that a final plan under the Community Redevelopment Law does not require an architectural plan complete with engineers' specifications; it contemplates, rather, a comprehensive method or scheme of action; a way proposed to carry out within the essential framework of the law a particular project of redevelopment.

 In our view *Redevelopment Agency* v. *Hayes,* (1954) *supra,* 122 Cal.App.2d 777, correctly sets forth the law relating to the delegation of power to a redevelopment agency when it adopts *Belovsky* v. *Redevelopment Authority* (1947) 357 Pa. 329 [54 A.2d 277, 283, 172 A.L.R. 953], and quotes therefrom at page 807 [20] as follows: " 'The fact is, however, that the act contains as definite a description of what constitutes a blighted area as it is reasonably possible to express; in regard to such factors as the selection and the size of the areas to be redeveloped, the costs involved, and the exact form which the redevelopment in any particular case is to take, it was obviously impossible for the legislature to make detailed provisions or blueprints in advance for each operation. ... All that the legislature could do, therefore, was to prescribe general rules and reasonably definite standards, leaving to the local authorities the preparation of the plans and specifications best adapted to accomplish in each instance the desired result, a function which obviously can be performed only by administrative bodies. While the legislature cannot delegate the power to make a law, it may, where necessary, confer authority and discretion in connection with the execution of the law; it may establish primary standards and impose upon others the duty to carry out the declared legislative policy in accordance with the general provisions of the act.' "

Although *Hayes* dealt with an agency power to determine blight, the principle announced appears equally applicable to the agency power to effectuate redevelopment.

In another redevelopment case, *People* ex rel. *Adamowski* v. *Chicago Land Clearance Com.* (1958) 14 Ill.2d 74 [150 N.E.2d 792, 796 [3, 4]], the Supreme Court of Illinois, in considering a contention of unlawful delegation of authority, quoted from one of its own former decisions as follows: " 'The constitutional doctrine of separation of powers was not intended to confine the legislature to the alternatives of complete inaction or the imposition of rigidly inflexible laws which would distort rather than promote its objective. When

it is necessary, the legislature may commit to others the responsibility for the accomplishment of the details of its expressed purpose. The scope of permissible delegation must be measured in terms of the complexity and diversity of the conditions which will be encountered in the enforcement of the statute. So it has been said almost from the outset that the legislature may authorize others to do things which it might properly, but cannot understandingly or advantageously, do itself.' '' (See also *Upham* v. *Supervisors of Sutter County* (1857) 8 Cal. 378, 383-384.)

▇ It appears to us likewise that the scope of permissible delegation of power to the agency should ''be measured in terms of the complexity and diversity of the conditions which will be encountered'' in the performance of the final plan.

The Legislature can be assumed to have recognized that a final plan must be enacted before the agency can commence acquisition of land and that thereafter the land must be resold to redevelopers for actual construction so that some appreciable interval of time must elapse between the evolution and formulation of the final plan by the agency, its adoption by the legislative body and its ultimate fulfillment by redevelopers. Obviously, some flexibility in the final plan so far as it relates to section 33707 is essential to avoid the necessity of constantly seeking amendment by the legislative body (see *ante,* fn. 4) each time that some unforeseeable exigency arises. Examples of such exigencies already existing in the particular project area are depicted in the record and noted by the trial court. During the planning stages it appeared that the land owned by Greater Los Angeles Plans near Fifth and Flower Streets might be developed as a music center. Apparently this will not occur. The three blocks bounded by First, Hope, Second and Hill Streets are presently owned by the County of Los Angeles and it appears that it had been contemplated to erect multistory parking on at least part of that area and that tunnels across First Street and columns in the middle of Grand Avenue were constructed in contemplation of such development. Thereafter it developed that the county seemingly intends to abandon the construction of such parking facilities.

▇ It cannot be seriously argued that a final plan must be a compilation of blueprints or working drawings, representing final engineering studies, primarily because the agency is not the one who does the building. The final plan is

not required to be precise from an engineering standpoint but only as reasonably precise and detailed from a planning standpoint as may be expected in light of "the complexity and diversity of the conditions which will be encountered."

Manifestly section 33707 is but one of numerous sections set up as directives to guide the agency in formulating the plan, all to the end of achieving the legislative objective. As an ultimate standard for testing the sufficiency of an agency-proposed plan, section 33731 (compare present § 33367) provides that "On the question of the adoption of any redevelopment plan, the legislative body shall determine:

"(a) Whether the plan would redevelop the area in conformity with this part and in the interests of the public peace, health, safety, and welfare.

"(b) Whether the adoption and carrying out of the redevelopment plan is economically sound and feasible." (Stats. 1951, ch. 710, § 1, p. 1938.) Each plan must come within the statutory standards and its adequacy necessarily must be gauged by relating its overall content to the particular project area and objectives, all in the light of the community, size, character and needs. In *Holloway* v. *Purcell* (1950) 35 Cal.2d 220 [217 P.2d 665], a statute authorized the Highway Commission to exercise its authority "on such terms and conditions as in its opinion will best subserve the public interest." (P. 231 [12].) This court held that such requirement provided an adequate standard to guide the commission. (See also *City & County of San Francisco* v. *Superior Court* (1959) 53 Cal.2d 236, 250 [10] [1 Cal.Rptr. 158, 347 P.2d 294].) ▪ Section 33707 does not require that in a redevelopment plan there shall be any minimum percentage of open space or that there shall be any limitations on the type, size, height, number or proposed uses of buildings or that there shall be dwelling units at all or any particular number or kind of dwelling units per unit of area, or that any of the project area must be devoted to public purposes. What section 33707 appears to say is that if the plan embraces any of the matters included in this section, they shall be shown in the plan. (See also § 33742.)

The contention that the "amount of open spaces" cannot be ascertained is answered by reference to the map on page 3 of the final plan; to section H2d of the plan and to section H5 relating to land coverage. The "street layout" is likewise shown on the map, page 3. (And see Health & Saf. Code, § 33735.) Limitations on the type, size, height, number and proposed use of buildings are ascertainable by reference

to the map, page 3, and to section H2a-g and section H3a-f. The number of dwelling units "is tentatively 3100 with an additional 460 dwelling units" in case of alternative use of one block.

Much stress is laid on the use of the word "tentative" in relation to various items of planning such as the street rights-of-way and easements, the proposed utilities, the proposed water system, the electric power and street lighting system, the gas and telephone systems, and the proposed grading. The use of the word "tentative" throughout the plan is in connection with and related to the schematic plans contained in the final plan, which schematic plans are of such a scale that it would be impossible to use such plans or maps for construction purposes. As concluded by the trial court, it would reasonably appear that what is meant is that the attached schematic plans show the approximate location, size, etc., of the various items referred to as "tentative."

The inclusion of certain "alternative use" provisions in the final plan is attacked as rendering it uncertain and constituting an unlawful delegation of power to the agency. The inclusion of alternative uses does not give the agency *carte blanche* to determine the uses for which these areas are to be developed. Each alternative is specific and definite. Any discretion vested in the agency is limited to accepting the proposals of redevelopers to develop the area pursuant to one of the alternatives which would best serve the public interest and carry out the Community Redevelopment Law and as such is a valid delegation of authority.

Contention is further made that the plan provision section H8b reserving to the agency the right of approval of architectural plans is an unlawful reservation of power. Section 33272 provided that an agency may obligate a purchaser to comply with conditions which the agency deems necessary to carry out the purposes of the redevelopment. Assurance of "harmonious architectural congruity" seems not only to be a reasonable condition in a redevelopment project but a failure to reserve authority in this field conceivably could be subject to adverse criticism.

Finally, as to compliance with section 33707, it is contended that the agency has reserved to itself "the uncontrolled power and right to invalidate any reconveyance, lease or resubdivision in the Project Area for a period of thirty years" and thereby imposed an unlawful restraint on alienation. But what the final plan actually declares (§ H8e2) is

that all contracts committing the agency to convey land shall provide that "reconveyances, leases and resubdivisions shall require the prior written consent of the Agency." Section 33741 required that the final plan contain adequate safeguards to insure that the redevelopment be carried out as planned and section 33709 specified that any lease or sale of land shall be conditioned on the redevelopment and use of the property in conformity with the plan. It does not appear that the plan provisions go beyond the law or constitute an unlawful reservation of power.

## 7. OWNER PARTICIPATION AS PROVIDED BY FINAL PLAN

At the time of adoption of the tentative plan by the council in November 1956, section 33701 specified that "Every redevelopment plan shall provide for participation in the redevelopment of property in the project area by the owners of all or part of such property if the owners agree to participate in the redevelopment in conformity with the redevelopment plan adopted by the legislative body for the area. This section does not prohibit the owners from submitting an alternative plan pursuant to this part."

Thereafter, effective in September 1957, the following paragraph was added to section 33701 (Stats. 1957, ch. 1696): "With respect to each redevelopment project, each agency shall, within a reasonable time after the adoption of the tentative plan and before the adoption of the final plan, adopt and make available for public inspection rules to implement the operation of this section in connection with the plan."[5] (See present §§ 33339; 33345; 33380.)

As already related herein, on May 7, 1958, the agency adopted and made available for public inspection rules im-

---

[5]Other provisions relating to owner participation, as they read at the times here involved, are:

§ 33702: "Every redevelopment plan which contemplates property owner participation in the redevelopment shall contain alternative provisions for redevelopment of the property if the owners fail to participate in the redevelopment as agreed."

§ 33745: "If the redevelopment plan adopted provides for participation in the redevelopment of property in the area by the owners of such property, and if for 30 days after the adoption of the plan, the owners fail or refuse to enter into a binding agreement for participation in accordance with the plan, the alternative provisions provided for in section 33702 become effective as the official redevelopment plan of the project area. The legislative body may extend the 30-day period by not more than 60 days."

§ 33746: "After the adoption of the redevelopment plan and the expiration of the period provided for in section 33745, further proceedings

plementing the provisions for owner participation as provided in the final plan; on the same day the agency formulated and adopted a final redevelopment plan, which it thereafter submitted to the planning commission for report and recommendation; and subsequently this plan was presented to the council.

Pertinent provisions respecting owner participation which are contained in the final plan and in owner-participation rules adopted by the agency are set forth in the footnote.[6]

---

which affect the specific area in which the owners refused to participate with reference to redevelopment of the project area shall be stayed for 30 days. . . .''

See also section 33275.

[6]Final Plan provisions:

''C 7. *Owner-Participation*

''Pursuant to and subject to sections 33275, 33701, 33702 and 33745 of the Law, and also subject to provisions of Section D herein, owners of real property within the Project may retain ownership thereof upon execution of agreements with the Agency to participate in the redevelopment in conformity with the Plan.

'' . . . . . . . . . . . .

''D 4. *Obligations of Owner-Participants*

''Owners of real property in the Project area who choose to participate in the redevelopment in accordance with the Plan and pursuant to the applicable provisions of the Law may be permitted to do so subject to the rules and regulations adopted by the Agency and on file in the Agency's office.

''It is hereby established that, due to the complexity of the sizes and shapes of parcels individually owned prior to acquisition by the Agency and in order to assure logical development, participation by owners of real property in the Project area shall be limited to not less than a planned unit of development as determined by the Agency and subject to the controls set forth in Section H hereof for any single owner-participant. For the purpose of clarification, a single owner-participant may be either an individual or a group of individuals bound together by contract so as to be classed as a single entity by law.

''a *Acceptable Types of Owner-Participants*

'' (1) Individuals, groups of individuals, corporations or other lawful entities as herein defined, who, prior to adoption or approval of this Plan by the City Council, are owners of real property in the project area and who shall elect to develop or redevelop their properties subject to regulations on file in the Agency's office and who shall prove financial ability to develop or redevelop their properties in accordance with the Plan and who shall assume financial responsibility for their pro rata share of the costs of the necessary site improvements related thereto, including any required demolition of structures, installation of utilities, grading, street changes and street improvements.

'' (2) Owners, prior to adoption or approval of this Plan by the City Council, of improved real property in the Project area, whose improvements, as determined by the Agency, may be permitted to remain and who shall elect to participate in the redevelopment by the alteration of

Objectors attack the owner-participation provisions of the final plan and the owner-participation rules with various contentions that the statutory requirements as to permitting

said improvements, subject to the rules and regulations on file in the Agency's office, and who shall prove financial ability to complete said alterations within a reasonable time as fixed by the Agency and who shall assume financial responsibility for their pro rata share of the costs of the necessary site improvements, including the installation of required utilities, grading, street changes and street improvements.

"b *Failure of Owner to Participate as Agreed*

"In the event of default or breach of an owner-participation agreement or any of the terms and conditions of any such agreement by a participating owner whose eligibility to participate is established as herein set forth, the Agency shall acquire the property of said owner and shall dispose of said property in accordance with the Plan and the Law.

"The amount to be paid said owner in the event of purchase after such default or breach shall be the fair value of the property as of the date of execution of the agreement or, in the event of acquisition by condemnation, the amount fixed by Court or Jury.

"If for thirty (30) days after adoption of the Plan by the City Council, an owner fails or refuses to enter into a binding agreement for participation in accordance with the Plan, the alternative provisions set forth above become effective, unless extensions of time as provided for in the Law are granted for not to exceed sixty (60) days.

"c *Area Available to Former Owners for Development*

"Subject to the rules and regulations on file in the Agency's office governing the repurchase of properties by former owners of properties elsewhere in the Project area, the area bounded by Second, Hill, Fourth and Olive Streets will be available to said former owners of properties for development in accordance with the Plan.

". . . . . . . . . . . . .

"H 8d. *Owner-Participation*

"Owner participants shall conform to the requirements of the Plan."

The owner-participation rules adopted on May 7, 1958, by the agency pursuant to section 33701 (Agency Exhibit 31), read in part as follows:

"A. GENERAL REGULATIONS

". . . . . . . . . . . . .

"3. An owner must agree to be governed in the redevelopment of the property subject to the 'owner-participant agreement' by all the requirements, regulations and controls set forth in the Redevelopment Plan (Subdivision H.)

"4. An owner must submit proof of his qualifications, including financial responsibility, to carry out the terms and provisions of the 'owner-participant agreement'.

". . . . . . . . . . . . .

"B. SPECIAL REGULATIONS

". . . . . . . . . . . . .

"1.b. An Owner must agree to repair, rehabilitate, improve, modernize, alter or reconstruct the existing building so as to make the same compatible with the type of redevelopment proposed for the Project Area and in accordance with the land uses permitted by the Redevelopment Plan;

owner-participation have not been met, or that the rules and plan provisions are unfair and invalid.

Certain of the contentions in this regard may be summarized as follows: The final plan does not comply with section 33701 of the Health and Safety Code because that section requires that redevelopment plans contain provisions allowing owner participation by any and all owners of property within the project area who desire to do so, and agree to redevelop their property in conformity with such plan. The final plan herein requires that prospective owner-participants qualify as being financially responsible and able to perform their owner-participation agreement with the agency. The plan further sets forth proposed uses for certain areas of the project which require the assembly of large plots of land. The requirement that the prospective owner-participant be financially responsible, when combined with the planning proposals requiring assembly of large plots of land, makes it impossible for many small property owners to participate. Therefore, it is argued, the final plan violates section 33701.

That there is no absolute right of owner participation in the redevelopment of each separately owned parcel of land within the project area is apparent from the provisions of section 33701 itself in that it provides that as a condition thereof an owner desiring to participate must agree ''to participate in the redevelopment in conformity with the redevelopment plan adopted by the legislative body for the

---

and all in accordance with Plans submitted by the owner and approved by the Agency.

''c. An owner must agree to reimburse the Agency for that proportionate share of the cost of site improvements properly allocable to his property.

''2. *Properties on Which Existing Buildings Will Be Removed by Owner.*

''a. An owner must already own property, or must agree to acquire such additional land as may be necessary from the Agency, which will provide an appropriate building site for the erection of a structure in accordance with the Redevelopment Plan; provided, however, that any building site proposed to exist or to be established shall not be subject to owner-participation if it interferes with the plan for a larger unit of development.

''b. Under these circumstances, the Agency will agree to sell the owner such additional land at its fair market value as determined by the Agency, and pursuant to a negotiated sale as provided in Sections 33267 and 33268 of the Community Redevelopment Law.

''c. An owner must agree to reimburse the Agency for that proportionate share of the cost of site improvements properly allocable to his property.''

area." "Redevelopment," as defined by section 33013 (see present § 33020), includes provision for "such residential, commercial, industrial, public, or other structures or spaces as may be appropriate or necessary in the interest of the general welfare." Patently, the Community Redevelopment Law does not contemplate that every redevelopment plan shall be so designed as to accommodate a redevelopment of each separate parcel within the financial ability of the present owner. In *Fellom* v. *Redevelopment Agency* (1958) 157 Cal. App.2d 243, the court commented at page 250 [4] [320 P.2d 884] : "We have no doubt that the Legislature, in enacting the Community Redevelopment Law, hoped that redevelopment would be possible in areas such as the Diamond Heights Area with the participation and cooperation of the owners of the property within the 'blighted' area, but it is also apparent from a reading of all the sections and the entire law that there is provision for a method of redevelopment without participation by the owners of the land. For instance, the express power of eminent domain would negate the necessity of participation by the owners, if the agency in its exercise of its constitutional powers acts fairly and without discrimination. Even the language of section 33701, 'Every redevelopment plan shall provide for participation in the redevelopment of property in the project area by the owners of all or part of such property . . .,' contemplates that participation be not extended to all owners of the property. This, of course, imposes upon the agency a duty of reasonableness and good faith, if they wish to make participation available to part of the owners of the property embraced in the redevelopment project."

Because the final plan necessitates assembly of large plots to carry out the proposed uses in certain areas of the project and requires prospective owner-participants to qualify as financially responsible, and thus in some cases renders it impossible for small property owners, as such, to separately participate with the same status, does not in and of itself establish a violation of section 33701.

The question with respect to the owner-participation provisions would appear to be, as stated in the *Fellom* case, whether the agency has fulfilled its obligation of "reasonableness and good faith." The imposition of reasonable terms and conditions upon the right to participate as the agency may deem necessary or appropriate in light of the redevelopment proposed would seem to be not only within the power but a duty of the agency and this would include such

rules as would reasonably assure fulfillment of an owner-participation agreement including such matters as the establishment of financial ability. The plan restrictions as to land coverage apply equally to redevelopers as well as to owner-participants and there does not appear to be anything unfair or discriminatory in requiring that an owner-participant, as a condition of his right to participate, shall subject himself to the same restrictions that are required of an outside developer and which are reasonably necessary to achieve a successful redevelopment. The record does not sustain a contention that the agency acted unreasonably or in bad faith in adopting the owner-participation provisions of the final plan.

So far as concerns delegation of authority to the agency to require that prospective owner-participants demonstrate their financial ability, it appears that such authority is implicit in section 33701 requiring the agency to adopt rules to implement ''the operation of this section in connection with the plan'' which here requires, as set forth in section 33701, that owner participation be contingent upon the owner's agreeing ''to participate in the redevelopment in conformity with the redevelopment plan.'' Requiring proof of ability to perform by an owner-participant is contemplated by the requirement of section 33741 that ''No plan shall be approved unless it contains adequate safeguards that the work of redevelopment will be carried out pursuant to the plan. ...'' We perceive no substantial difference between the authority to require demonstration of financial ability of an owner-participant and the authority granted to the agency in section 33272 to require purchasers to ''Begin the redevelopment . . . within a period of time which the agency fixes as reasonable'' and to ''Comply with other conditions which the agency deems necessary to carry out the purposes of this part.'' Here the Legislature has specifically authorized the agency to adopt rules ''to implement the operation'' of owner participation in connection with the final plan. As expressed in *First Industrial Loan Co.* v. *Daugherty* (1945) 26 Cal.2d 545, 549 [1] [159 P.2d 921], ''To narrowly proscribe the rule-making power of the [agency] would be to overlook one of the fundamental purposes of the policy of delegation of powers and to deprive the Legislature and the people of the state of one of the major benefits thereof. The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means

they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the 'power to fill up the details' by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect, and provision by the Legislature that such rules and regulations shall have the force, effect, and sanction of law does not violate the constitutional inhibition against delegating the legislative function.''

 Certainly an agency rule requiring demonstration of financial ability of an owner-participant can be said ''to promote the purposes of the legislation and to carry it into effect.''

 What has just been said applies with equal effect to the suggestion that participation by each owner should be settled prior to adoption of the redevelopment plan by the agency, and that to such end the size and location of all building sites be rigidly established by the agency prior to negotiations with prospective owner-participants. No such requirement appears in the statute. Further, as pointed out by the agency, the flexibility provided by the plan as finally adopted by the council would seem to permit of at least as great an opportunity of participation by owners as if the plan had been so rigid that varying proposals by owners, however meritorious, could not be adapted within the framework of the overall final plan.

 With respect to the time of adoption of owner-participation rules, it has already been pointed out that the language of section 33701 directing that such rules are to be adopted and made available for public inspection ''a reasonable time before the adoption of the final plan'' was added some four months *after* adoption of the tentative plan by the council. Although the agency thereafter adopted and made public its owner-participation rules on the same day that it formulated and adopted a final redevelopment plan, this was still two weeks prior to submission of the final plan to the council, over six weeks before the opening by the council of public hearings on the final plan, and almost ten months in advance of adoption of the final plan by the council.[7] Under the circumstances no prejudice to objectors is established.

[7] It may be noted that some two and one-half months *after* adoption of the final plan by the council the Legislature again amended section 33701, effective ''immediately'' (June 1959), to require that the owner-

The further suggestion that at the time of adoption of the tentative plan statements made by the agency and by agency members indicated that the final plan would provide for owner participation more exactly and in more detail than it does, finds no substantial support in the record. Such statements were to the general effect that the matter was under consideration and would be dealt with further at the final plan stage, and that in cases where as to any parcel the agency determined it to be feasible and possible in accordance with the final plan the agency would endeavor to make participation agreements with owners. Thus there is no merit in the contention that the final plan is in this respect not based on the tentative plan, and so violates the requirement of section 33703 that "A redevelopment plan ... shall be based upon the approved tentative plan...."

 The complaint of unconstitutional discrimination by objector Goldman in that the final plan requires a participating owner to assume financial responsibility for his pro rata share of the costs of necessary site improvements (see paragraph D 4 of fn. 6, *ante*), whereas redevelopers are exempted from a similar financial responsibility, likewise is without merit. We are cited to no provision in the final plan which would extend such an exemption. On the contrary, it appears that in selling the land to either outside redevelopers or to owners who wish to participate with respect to nonowned land (i.e., to buy additional land), the agency is required to sell at fair market value for the use to which the land is to be put under the final plan. (See present §§ 33430-33433, 33441; and former § 33267, subd. (d), and § 33709.) Fair market value would, of course, include the value of the necessary site improvements for which a participating owner who retains ownership of his own land is required to pay his pro rata share. Thus no unfair discrimination is shown. (See *Randolph* v. *Wilmington Housing Authority* (1958) 37 Del.Ch. 202 [139 A.2d 476, 486 [9-10]].)

### 8. ECONOMIC FEASIBILITY OF FINAL PLAN

 The trial court found and concluded that substantial evidence and the relevant law support the finding and

---

participation rules be adopted and made public by the agency a reasonable time before "*its* adoption" (italics added) of the final plan. (Stats. 1959, ch. 1102.) However, neither the agency nor the council had the guidance, at the times here involved, of this further amendment, and their interpretation of the earlier language to mean before the *council's* adoption of the final plan would not reasonably appear subject to criticism.

determination of the council that the final plan is economically sound and feasible. (§ 33731.)[8] The only challenge to this determination is made by objector Trautwein, who appears to complain because the plan provides that oil and mineral rights below a depth of 500 feet shall not be taken from the present owners of the land when it is purchased or sought through eminent domain proceedings, but that the plan fails to provide for a drill site whereby the owners may recover any oil that might be found below the surface of their property. The net effect, says objector, is that the owners will be deprived of their mineral rights, for which the plan contains no payment provision, thereby rendering the project economically unfeasible, and unlawful. In the absence of evidence establishing with some degree of reliability or certainty the existence of commercial oil deposits under the project area, this contention is without substance. No such evidence is cited or, seemingly, was offered, although reference is made to certain testimony on the general subject of the possibility of valuable deposits. Objector's position on this point has no merit. The current value and reasonably potential uses, not mere speculative possibilities, are here relevant. It may also be noted that the trial court appears correct in its comment that whether or not a taking to a depth of 500 feet would or would not be for all practical purposes a taking of any underlying valuable mineral rights is not properly at issue in this proceeding but will arise when, if and as the agency exercises the power of eminent domain. (See *Pacific Gas & Elec. Co.* v. *Hufford* (1957) 49 Cal.2d 545, 552-553 [1] [319 P.2d 1033].)

### 9. Fairness of Hearing Before City Council

Objectors contend that for various reasons they were denied a full and fair hearing before the city council. Section 33730 provides that at the public hearing on the final plan the council ''shall consider ... all evidence and testimony for or against the adoption'' of the plan.

#### A. Economic Feasibility Reports.

 Objectors first complain of interpretations placed by the agency or by agency members or witnesses on three ''economic feasibility'' reports or ''land use surveys''

[8]Section 33731: ''On the question of the adoption of any [final] redevelopment plan, the legislative body shall determine: ... (b) Whether the adoption and carrying out of the redevelopment plan is economically sound and feasible.''

(termed the Babcock report, the Stanford Research report, and the Hoyt report) made on behalf of the agency. It is conceded, however, that all three reports were placed before the city council, and it appears that objectors themselves called to the attention of the council the asserted negative aspects of the reports. Objectors' suggestion that the agency in order to insure a fair hearing should present objectors' position as well as its own with respect to these reports is untenable. Further, no concealment or misrepresentation by the agency is shown.

### B. Appraisals.

 Objector Trautwein declares in his brief that ''The record is replete with the efforts of the opponents to obtain information of the two appraisals made for'' the agency, and refers us to some 72 pages of the record, but does not otherwise identify or describe such appraisals except to again refer to them as ''real estate appraisal reports'' one of which ''had cost $84,000,'' an amount stated to be beyond the means of the individual property owners to expend ''to show that the Agency's plan was not economically feasible.'' Citing three discovery cases (*Suezaki* v. *Superior Court* (1962) 58 Cal.2d 166 [23 Cal.Rptr. 368, 373 P.2d 432]; *Oceanside Union School Dist.* v. *Superior Court* (1962) 58 Cal.2d 180 [23 Cal.Rptr. 375, 373 P.2d 439] and *San Diego Professional Assn.* v. *Superior Court* (1962) 58 Cal.2d 194 [23 Cal.Rptr. 384, 373 P.2d 448]), this objector declares ''it is clear that this information should have been made available to these appellants [objectors] both in the hearing before the City Council and in the hearing before the Superior Court.''

It is not suggested, however, that objectors made any effort to secure the information by means of discovery procedures. Additionally, it appears that at the public hearing before the city council the assistant city attorney informed the council that if it wished to know ''the total appraisal figure'' it could require disclosure of that information, but that the council chose not to do so. Further, since as already discussed the issue before the trial court was whether or not there was a reasonable basis for the council's finding of economic feasibility, evidence as to appraisals which the council did not have before it would not appear relevant. Objectors, although their contentions are often expressed with considerable lack of precision, do not appear to claim that the finding of eco-

nomic feasibility is without support in the record. In short, no error is shown on this issue.

### · C. Insurance Company Office Space.

 Objector Briggs complains that the Hoyt economic or land use report "justified the demand for institutional office space in the Project Area on the basis that a major insurance company had indicated a demand for a million square feet of office space in the" area, but that "Before the City Council, the Agency refused to divulge the name of the company." This situation was disclosed to the trial court, before whom Mr. Sesnon, chairman of the agency, also testified that the company was Occidental Life Insurance Company and that at the time of the hearings before the council the witness knew that agency member Clarke was a member of the board of directors of Occidental and also its past president; further, Mr. Sesnon stated that the company had requested that its name be kept confidential. Objector Briggs asserts that "we should have been permitted to inquire [at the council hearings] into all facets of the negotiations concerning the potential acquisition of land by Occidental." It appears, however, that there were no such negotiations. Mr. Sesnon testified that none had been entered into, and, further, that the fact that Occidental wanted to build in the project area had nothing to do with the agency's decision to reject the alternative plan filed by Briggs, which would have excluded its property from the project. Although objector now suggests that perhaps there might have existed in some fashion a conflict of interest flowing from Mr. Clarke's connection with both the agency and Occidental, its particular complaint appears to be that the agency should not have submitted to the council a redevelopment plan which would include in the project area Briggs' south of Fourth Street property, but, rather, should have expressed no opinion on this property and permitted the "Council to make up its own mind." The statute, however, places upon the agency the duty to formulate and submit to the council "a redevelopment plan for each project area" (§ 33700 et seq.), and no unfairness to objectors is shown in the respect here involved.

### D. Mr. Sesnon's Membership in GLAPI.

 As related by objector Briggs, Mr. Sesnon, agency chairman, for many years had been a member of Greater Los Angeles Plans, Inc., a nonprofit corporation (herein called GLAPI), and there is some evidence that he was a director thereof at the time of the hearings before the council. GLAPI

owns some 14 parcels of property within the project area, and is said by objector to be ''one of the five major landowners in that portion of the Project Area located south of Fourth Street'' (i.e., the portion which Briggs sought to have excluded). GLAPI's articles of incorporation and its bylaws were submitted to the city council at the time of the public hearings, and Mr. Sesnon's relationship to GLAPI was also inquired into in great detail at those hearings. Although objector does not suggest any concealment of facts in this connection, it is urged that Mr. Sesnon ''could not properly act as a member of the Agency on all matters relating to the adoption of the Final Plan when he was at the same time directly affiliated with the largest property owner in the Project Area,'' and speculation follows concerning ''the possible conflicting interests that could have motivated Mr. Sesnon when he voted against the adoption of the Briggs alternative plan eliminating the area south of Fourth Street.''

The law concerning possible conflicts of interest is, however, found in the statute and need not be the subject of speculation. (§§ 33236, 33237.)[9] It is not shown, or even suggested, that Mr. Sesnon had acquired any interest in any of the property within the project area or had failed to make a full disclosure of his interest in and connection with GLAPI, or that the agency proposed to acquire any property or interest therein in violation of the applicable code sections. Objector's contention that he was nevertheless in some way deprived of a fair hearing is without merit. *Griggs* v. *Borough of Princeton* (1960) 33 N.J. 207 [162 A.2d 862], involved other facts and other law, and lends no support to the position of objector.

Other suggestions made in passing, that perhaps objectors did not receive a fair hearing before the city council are so unsubstantiated as not to merit discussion.

---

[9]Section 33236: ''No agency or community officer or employee who in the course of his duties is required to participate in the formulation of or to approve plans or policies for the redevelopment of a project area shall acquire any interest in any property included within a project area within the community. If any such officer or employee owns or has any direct or indirect financial interest in such property, he shall immediately make a written disclosure of it to the agency and the legislative body which shall be entered on their minutes. Failure to so disclose constitutes misconduct in office.''

Section 33237: ''An agency shall not acquire from any of its members or officers any property or interest in property except through eminent domain proceedings.''

## 10. Jury Trial

In reliance upon various of the above stated contentions attacking the validity of the subject redevelopment plan, objector Babcock included in the complaint filed in his action claims for damages allegedly resulting from the ''purported adoption of the Ordinance approving the final plan,'' and now contends that he was entitled to a jury trial on such damage claims. This contention is disposed of by our holding that the plan is valid.

## 11. Costs

 Objector Babcock, declaring that ''the question of public use is foreclosed by judgment on a petition under the Confirmation Act'' (§ 33957,[10] formerly 33961), further urges that the trial court erred in granting judgment for costs against Babcock in the agency's proceeding. *San Joaquin etc. Irr. Co.* v. *Stevinson* (1913) 165 Cal. 540 [132 P. 1021], relied upon by objector, was an eminent domain proceeding in which the trial court granted defendant property owner's motion for nonsuit and gave judgment accordingly. Although on appeal the judgment was reversed, it was held (p. 542) that appeal costs could not constitutionally be awarded against the losing landowner. (See also *City of Stockton* v. *Vote* (1926) 76 Cal.App. 369, 408 [21] [244 P. 609] in which appeal costs were charged to plaintiff city although it secured a reversal with respect to the damages award.)

Section 1255 of the Code of Civil Procedure, enacted in 1872, states that in eminent domain actions ''Costs may be allowed or not, and if allowed, may be apportioned between the parties on the same or adverse sides, in the discretion of the court.'' However, in *San Diego Land etc. Co.* v. *Neale* (1891) 88 Cal. 50 [25 P. 977, 11 L.R.A. 604], an eminent domain proceeding, it was held (p. 68) that ''Whatever may be the constitutional rights of the parties ... it will be a proper exercise of discretion'' to require the condemner to pay the costs of trial and of an unsuccessful appeal by the owner from an order granting the condemner a new trial with respect to damages, and the trial court was directed to tax the costs accordingly.

In *City & County of San Francisco* v. *Collins* (1893) 98 Cal. 259 [33 P. 56], the trial court, after judgment had gone in favor of the condemner, disallowed a part of the owners'

---

[10]Section 33957: ''... said judgment shall permanently enjoin the institution by any person of any action or proceeding raising any issue as to which said judgment is binding and conclusive.''

trial costs. On appeal it was held (pp. 262-263) that the court's discretion to allow and to apportion costs is limited by the owners' constitutional right to full compensation for their property, and that the owners were entitled to recover their trial costs in full from the condemner subject to the court's power to determine what cost items were proper or improper (i.e., necessary or unnecessary). The trial court's order was reversed with directions to allow the disputed costs.

The owner's constitutional right to be free from costs in an action to take his property for a public use was again declared in *Collier* v. *Merced Irr. Dist.* (1931) 213 Cal. 554 [3 P.2d 790], in which plaintiff riparian owner sued defendant irrigation district for damages allegedly suffered by reason of invasion of plaintiff's rights in a certain stream, and for an injunction against further encroachment thereon. Defendant answered contending that a public use had intervened, but offered to pay plaintiff damages if the court found it had invaded plaintiff's rights in the stream. The court held for defendant on the issue of public use, and the jury's verdict was for defendant with respect to damages. The court then denied plaintiff his trial costs. On appeal, though plaintiff again lost on the issues of public use and of damages, it was held (p. 572 [12]) that "The cause having been converted practically into a condemnation proceeding and appellant having been paid in 'benefits' [to his land, rather than in monetary damages], the constitutional provision ... seems to be sufficient to vouchsafe the award to him free from the costs of respondent and with his own costs as well." And in *Smith* v. *Pacific Gas & Elec. Co.* (1933) 132 Cal.App. 681 [23 P.2d 444], in which plaintiff owners sued the utility company after it erected poles across their land and strung wire thereon without plaintiffs' permission, and defendant filed a cross-complaint seeking to condemn a right of way across the land, the court allowed the condemnation but awarded plaintiffs damages plus trial costs. On plaintiffs' unsuccessful appeal it was declared (p. 683 [3]), "Being an action in the nature of eminent domain, the appellants [owners] are entitled to their costs on appeal."

In *Peabody* v. *City of Vallejo* (1935) 2 Cal.2d 351 [40 P.2d 486], defendant appealed from a judgment permanently enjoining it from storing any of the waters of a certain stream. Although on appeal the judgment was reversed and the cause remanded for a new trial, by reason of failure of the trial court to apply the correct legal principles, it was

held (p. 380 [25]) that under the ruling of *Collier* v. *Merced Irr. Dist., supra,* plaintiff riparian owners were entitled to their costs taxed by the trial court "from the inception of the present action" as well as (p. 384) their costs on appeal. And in *Heimann* v. *City of Los Angeles* (1947) 30 Cal.2d 746 [185 P.2d 597], an inverse condemnation action in which plaintiffs prevailed but were denied costs in the trial court (p. 752) "on the ground that the judgment was such as could have been rendered by the municipal court," it was held on appeal (pp. 752-753 [1-3]) that plaintiffs had a constitutional right to recover costs, as otherwise they would be "deprived of the full measure of compensation to which" they were entitled.

On the other hand, in *Oakland* v. *Pacific Coast Lumber etc. Co.* (1916) 172 Cal. 332 [156 P. 468, Ann.Cas. 1917E 259], in which the owner unsuccessfully appealed because dissatisfied with the damages award, the court, although (p. 334) reaffirming the view expressed in *San Joaquin etc. Irr. Co* v. *Stevinson* (1913) *supra,* 165 Cal. 540, 542, that on a successful appeal by the *condemner* in which the judgment in favor of the owner is reversed the Constitution precludes recovery by the condemner of its appeal costs, declared (pp. 335-337) that where the owner loses on his *own* appeal, as distinguished from an appeal by the condemner, there is no constitutional inhibition against awarding appeal costs against him, as he was under no compulsion to appeal. And in *Yolo Water etc. Co.* v. *Edmands* (1922) 188 Cal. 344 [205 P. 445], in which plaintiff condemner upon objection by the owner was denied leave to amend its complaint to withdraw a portion of the land, and thereafter appealed successfully from the judgment for damages, costs on appeal were awarded against the owner with the comment (p. 347 [1]) that "The fault for that appeal lies wholly with the defendant, who causelessly insisted upon the plaintiff continuing the prosecution of the action which he desired to dismiss. No principle of justice and no constitutional provision require that the defendant be exempted from the costs caused by him in a proceeding because of an objection of that character." (See also *Los Angeles P. & G. Ry. Co.* v. *Rumpp* (1894) 104 Cal. 20, 23-24 [37 P. 859], in which an award of costs in a second trial was upheld against the owner, who had successfully appealed after the first trial but secured an even lower award the second time.)

Where neither pleadings nor evidence in an action involve a claim to a right to take private property for public use, it

is held that eminent domain principles do not apply and that appeal costs are properly levied against plaintiff owners who had prevailed in the trial court but lost on defendant's appeal. (*Crum* v. *Mt. Shasta Power Corp.* (1932) 124 Cal.App. 90, 95 [2] [12 P.2d 134].)

It is settled that clearance of blighted areas and redevelopment thereof are public uses. (*Redevelopment Agency* v. *Hayes* (1954) *supra*, 122 Cal.App.2d 777, 802-804 [12, 13].) Public use is, however, one of the issues which owners reluctant to give up their property may justifiably raise in eminent domain proceedings as well as in actions in inverse condemnation or "in the nature of eminent domain." Even though they may not prevail on this issue in either trial court or on appeal, it appears from the most recent expressions of the court that they are entitled to be free from costs in litigating it. (*Collier* v. *Merced Irr. Dist.* (1931) *supra*, 213 Cal. 554, 572 [12] ; *Peabody* v. *City of Vallejo* (1935) *supra*, 2 Cal. 2d 351, 380 [25].) In defending against the subject agency proceeding objectors challenged the council's finding of blight, upon which the factor of public use turns. Inasmuch as the agency has prevailed in this proceeding, then, if and when it seeks to condemn objectors' property, the matter of public use will have been removed from the issues. Under such circumstances we are persuaded that as to this aspect of the case the proceedings should logically be considered in the nature of eminent domain, with no costs to be assessed against the property owners.

## 12. Goldman Action

The Goldmans attack the subject redevelopment project on a variety of grounds. Those meriting discussion appear to be the following:

### A. Consent of Other Taxing Agencies.

It is contended that the final plan provides for "an illegal appropriation by the City Council of funds belonging to other taxing agencies, in that they provide for such tax allocation without first requiring the City Council to obtain consent to such allocation from such other taxing agencies." From this opening contention it is argued that the Community Redevelopment Law is unconstitutionally uncertain in failing to provide whether consent of other taxing agencies must first be obtained and as constituting an unlawful delegation of general and specific legislative powers to the local legislative body approving the plan.

California Constitution, article XIII, section 19 (added November 4, 1952), provides in part as follows: "The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied upon such taxable property in a redevelopment project each year by or for the benefit of the State of California, any city, county, city and county, district, or other public corporation (hereinafter sometimes called 'taxing agencies') after the effective date of the ordinance approving the redevelopment plan shall be divided as follows: . . ."

Sections 33950 through 33954 (now §§ 33670-33673), added by Statutes of 1951, became effective upon the adoption of the foregoing constitutional amendment and provide that any redevelopment plan may contain a provision for the division of taxes as therein set forth. The provisions of the tax allocation sections follow the constitutional provisions.

Admittedly, the tax allocation sections of the Community Redevelopment Law (§ 33950 et seq.) do not require the legislative body to obtain the consent of other taxing agencies who have theretofore or who will thereafter receive part of the taxes levied upon the property within the project area and, admittedly, the final plan here did not require nor was there obtained such a consent from the other taxing agencies such as the County of Los Angeles, the Los Angeles City School District and the Los Angeles County Flood Control District.

While not the subject of decision by a court of review, so far as research discloses, on the question of whether consent of such other taxing agencies is necessary to implement a tax allocation under the law, the California Attorney General has advanced the view that no such consent is required (27 Ops.Cal.Atty.Gen. at p. 357): "Nothing in the constitutional provision, [nor] in the applicable sections of the Health and Welfare Code ... requires any such agreement. Upon approval by the city council of a redevelopment plan containing a provision for division of taxes as authorized by California Constitution article XIII, section 19, and Health and Safety Code sections 33950-33954, such division became fully operative without further formalities."

The contention of the Goldmans in this regard that the tax allocation sections constitute an illegal abdication of legislative responsibility in permitting a municipal legislative body to deprive other taxing agencies of taxes without their consent is not sustainable, for the reason that the city council, although not an agency having statewide jurisdiction, in

approving a final plan for redevelopment is not then acting solely under the powers of a municipal legislative body upon a municipal affair but is also entitled to exercise the powers delegated to it when functioning under the state law to fulfill the specifically enunciated state purposes. (*Fellom* v. *Redevelopment Agency* (1958) *supra,* 157 Cal.App.2d 243, 247-248 [3].) So understood, there has been no usurpation of power by the city council as a municipal legislative body.

The noncharted taxing agencies here involved, the flood control and school districts, derive their taxing power from the general law and, subject to constitutional restrictions, the Legislature has absolute power over the organization, dissolution, powers, and liability of such corporations. (*Oakdale Irr. Dist.* v. *County of Calaveras* (1955) 133 Cal.App.2d 127, 134 [3] [283 P.2d 732]; *Petition of Sanitary Board of East Fruitvale Sanitary Dist.* (1910) 158 Cal. 453, 457 [111 P. 368].) Far from there being a constitutional limitation on the Legislature in respect to the tax allocation provisions of sections 33950 et seq., the 1952 constitutional amendment (art. XIII, § 19) declares: "The Legislature may provide that any redevelopment plan may contain a provision" for the allocation of taxes such as are provided by the challenged sections. It is clear that such taxing agencies have no vested right to powers of taxation. (*County of Mariposa* v. *Merced Irr. Dist.* (1948) 32 Cal.2d 467, 474 [4] [196 P.2d 920].)

We are therefore in accord with the opinion of the Attorney General that neither under the constitutional provisions nor the statutory provisions, is the legislative body required to obtain consent or agreement from other taxing agencies in respect to the allocation of taxes as provided in the final plan.

### B. Constitutionality of Tax Allocation Provisions as to Chartered City.

The Goldmans argue that the ordinance approving the final plan, which includes tax allocation provisions under section 33950 et seq. is unconstitutional as applied to the City of Los Angeles, a chartered city which has availed itself of the "municipal affairs" provisions of section 8 of article XI of the California Constitution, in that such a city may allocate or relinquish future tax revenue only by an amendment of its charter and not by adoption of an ordinance approving a redevelopment plan. This argument appears to

overlook the constitutional provision quoted hereinabove from section 19 of article XIII (as adopted in 1952) which specifically authorized the legislation pursuant to which the tax allocation was included in the final plan, and is without merit.

That the taxing power of a chartered city may be altered as authorized by the state Constitution admits of no doubt. A city is chartered under article XI, section 8, of the California Constitution which expressly provides, in part, that with the requisite population, a city "may frame a charter for its own government, consistent with and subject to this Constitution." Thus spoke the Constitution when the present city charter of Los Angeles was adopted. That the levy and collection of taxes by a chartered city is a municipal affair is clear, but it is equally clear that the broad power of taxation by a chartered city is limited not only by its own charter but by the California Constitution. (*Ainsworth* v. *Bryant* (1949) 34 Cal.2d 465, 469 [2] [211 P.2d 564]; *City of Glendale* v. *Trondsen* (1957) 48 Cal.2d 93, 98 [1] [308 P.2d 1]; *West Coast Advertising Co.* v. *San Francisco* (1939) 14 Cal.2d 516, 524 [4] [95 P.2d 138].)

Here the constitutional amendment of 1952 (art. XIII, § 19) specifically allowing tax allocation is controlling even though it may infringe upon a preexisting taxing power of a chartered city. It is significant that in point of time, section 19 of article XIII was passed later than section 8 of article XI allowing chartered cities to reserve to themselves control of all their "municipal affairs." Being special in nature and adopted later, the constitutional provision allowing a tax allocation of the municipal taxes of a chartered city and to that extent removing the collection of taxes from the realm of a municipal affair to that of a matter of general statewide concern must be held to control in the limited field that it covers. (See *Ainsworth* v. *Bryant* (1949) *supra*, 471-472 [4].)

The Goldmans make the further contention that the constitutional amendment (art. XIII, § 19) was permissive only (i.e., it could be accepted or rejected by municipalities) and that as to chartered cities it requires a charter amendment to become effective. No support for that contention appears in the amendment itself for it expressly declares "The Legislature may provide that any redevelopment plan may contain a provision that the taxes, if any, so levied ... by or for the benefit of the State of California, any city, county, city and

county, district, or other public corporation ... shall be divided as follows: . . . ''

It is immaterial whether the amendment is self-executing because it becomes ''operative just as soon as it is supplemented by so much legislation as is absolutely necessary to supply its deficiencies.'' (*Denninger* v. *Recorder's Court* (1904) 145 Cal. 629, 635 [79 P. 360].)

We conclude that the ordinance adopted by the council involving an allocation of tax revenue to become due to a chartered city was not an unlawful amendment to the city charter but was a valid exercise of power delegated to the council to act in a limited area as a state agency in providing for the allocation of taxes pursuant to the above mentioned constitutional amendment and statutory provisions.

### C. Use of Federal Funds.

The Goldmans next appear to argue that federal funds may not be made available to aid in the financing of the project because the approval of the final plan for federal financial assistance (given prior to adoption of the plan by the city council) violates certain requirements which the Goldmans assert are made by the Housing Act of 1949, as amended. (42 U.S.C.A. § 1441 et seq., espec. § 1460 (c).) However, contrary to contentions of the Goldmans, it appears that they have no standing to maintain a suit to enjoin the expenditure of federal funds by the agency. In *Kaskel* v. *Impellitteri* (1953) 204 Misc. 346 [121 N.Y.S.2d 848], affd. 306 N.Y. 73 [115 N.E.2d 659], the court declared at page 854 [3] [121 N.Y.S.2d] : ''Plaintiff contends, next, that the redevelopment plan violates the provisions of the National Housing Act of 1949 which, it is submitted, is intended for the protection of the taxpayers and residents of the city, in that it does not provide for redevelopment for predominantly residential uses and is therefore, illegal, and that the city should, in consequence, be enjoined from expending funds allocated to the city under it.

''If the city is improperly spending or contemplates spending funds contributed toward the project by the National Housing and Home Finance Agency, it is a matter for the consideration and concern of the federal administrator and not for the plaintiff and, on this feature, the court is of the view that the plaintiff is without legal capacity to sue.'' (See also *Gart* v. *Cole* (2d Cir. 1959) 263 F.2d 244, 250 [8], cert. den. 359 U.S. 978 [79 S.Ct. 898, 3 L.Ed.2d 929] ; *Pittsburgh Hotels Assn., Inc.* v. *Urban Redevelopment Authority*

(D.C.W.D. Penn. 1962) 202 F.Supp. 486, 492-493 [8], *Harrison-Halstead Community Group, Inc.* v. *Housing & Home Finance Agency* (7th Cir. 1962) 310 F.2d 99, 103-105 [2-5], in each of which cases it was held that the plaintiffs therein had no standing to litigate questions under the Housing Act of 1949, as amended.) *Shipley* v. *Smith* (1940) 45 N.M. 23 [107 P.2d 1050, 131 A.L.R. 1225], cited and relied upon by the Goldmans on this point, was an action to enjoin payment of money from the county treasury and in no way dealt with the expenditure of federal funds by a state agency.

In the case at bench the federal administrator has determined that the final plan is fully qualified under the federal law, has approved a federal loan and grant-in-aid and has executed contracts with the agency to effect such loan and grant. Even if a cause of action might exist in favor of taxpayers to enjoin an unlawful use of federal funds, it is not shown that such a suit could be prosecuted in a state court. In *Hunter* v. *City of New York* (Sup.Ct. 1953) 121 N.Y.S.2d 841, the plaintiff sought to have a contract between the redevelopment agency and the federal administrator declared invalid on the ground that the plan failed to comply with the federal law. In dismissing the complaint, after finding that the plaintiffs lacked legal capacity to sue, the court commented at page 847 [6] : "Assuming, arguendo, plaintiffs have legal capacity to sue under the Act and may maintain the action at bar, nevertheless the complaint must be dismissed for the reason that neither this court nor any other state court is the proper forum for such suit; state courts have no jurisdiction over the acts of federal officials acting as such in the administration of the federal laws or as agencies of the federal government."

### D. Conversion of Predominantly Residential Property into Predominantly Commercial Property.

The Goldmans also assert that the final plan "is incomplete and void for uncertainty in violation of the Fourteenth Amendment of the United States Constitution, and constitutes an unlawful delegation of legislative power in that, no ascertainable standard has been prescribed to enable a determination to be made by the agency as to whether the land may be acquired by condemnation in furtherance of a redevelopment project, which land is predominantly residential in character, for the purpose of converting the area into a predominantly commercial area."

The contention that the final plan is incomplete and void

for uncertainty in relation to the conversion of residential property into commercial property, is not supported by the facts. Mere reading of the proposed land use specifications as shown on the Proposed Land Use Final Plan (p. 3) and as described under the caption Land and Building Uses Proposed (final plan, pp. 19-23) is a sufficient answer.

So far as concerns any unlawful delegation of authority to decide between residential and commercial uses within the project area, no such authority appears to be delegated. The division between residential and commercial uses is fixed by the final plan adopted by the council and is not left to the discretion of the agency.

Further we find no constitutional inhibition on redevelopment of a predominantly residential area into a predominantly commercial area. (See *State* ex rel. *Dalton* v. *Land Clearance for Redevelopment Authority* (1954) 364 Mo. 974 [270 S.W.2d 44]; *Gohld Realty Co.* v. *City of Hartford* (1954) 141 Conn. 135 [104 A.2d 365, 369-370 [6]]; *Crommett* v. *City of Portland* (1954) 150 Me. 217 [107 A.2d 841, 850 [11]]; *Despatchers' Cafe, Inc.* v. *Somerville Housing Authority* (1955) 332 Mass. 259 [124 N.E.2d 528, 530 [1]]; *Foeller* v. *Housing Authority of Portland* (1953) 198 Ore. 205 [256 P.2d 752, 755 [23]]; and *Kaskel* v. *Impellitteri* (1953) *supra*, 121 N.Y.S.2d 848.) "Redevelopment," as specified in the law, includes "provision of such residential, commercial, industrial, public, or other structures or spaces as may be appropriate or necessary in the interest of the general welfare." (§ 33013.)

As pointed out in an extensive annotation on Urban Development Laws, 44 American Law Reports 2d 1414 at page 1444, "in the two instances in which redevelopment laws have been held invalid, the courts have been particularly concerned with their application to effect the acquisition of lands for resale for a commercial purpose." The annotation cites as the two cases *Adams* v. *Housing Authority of City of Daytona Beach* (Fla. 1952) 60 So.2d 663, and *Housing Authority of City of Atlanta* v. *Johnson* (1953) 209 Ga. 560 [74 S.E.2d 891], which are two of the cases relied upon and quoted at length in the Goldman brief. Any persuasion by these cases is substantially dissipated in that we find that in *Grubstein* v. *Urban Renewal Agency of City of Tampa*, (1959) *supra*, 115 So.2d 745, the Supreme Court of Florida reconsidered its own decision in the *Adams* case and appears to have virtually overruled it. It also appears that in *Bailey*

v. *Housing Authority of City of Bainbridge* (1959) 214 Ga.
790 [107 S.E.2d 812], the Supreme Court of Georgia held
that an amendment to the Georgia Constitution eliminated
the basis for unconstitutionality which it had found in the
*Johnson* case. *Edens* v. *City of Columbia* (1956) 228 S.C. 563
[91 S.E.2d 280], also cited by the Goldmans, was decided sub-
sequent to the A.L.R. annotation just referred to; it appears to
express the minority view as well as to turn upon the lack of
an enabling state constitutional amendment, and is not per-
suasive.

Such other contentions as appear to be made or suggested
by objectors or by amici curiae are without substance and so
totally devoid of merit as not to be worthy of further men-
tion.

In concluding our necessarily extensive review of this liti-
gation we gratefully acknowledge that the well organized
and comprehensively detailed memorandum of decision, pre-
pared by the able and diligent trial judge, has been of vast
assistance to this court.

For the reasons stated, the judgment in the special pro-
ceeding brought by the agency is affirmed except insofar as
costs are awarded against objectors; as to such costs it is
reversed with directions to the trial court to award to objec-
tors all proper trial costs and costs on appeal. The other
judgments appealed from are affirmed, with respondents to
recover costs.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobri-
ner, J., and Peek, J. concurred.

Appellants' petitions for a rehearing were denied March
25, 1964.